**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

KATHLEEN GRUNDOWSKI, as

ADMINISTRATOR OF THE ESTATE OF          CIVIL ACTION NO. 3:07-2207

BRETT SANTEE,

      Plaintiff,                                    (JUDGE CAPUTO)

         v.

UNITED STATES OF AMERICA,

      Defendant.

## MEMORANDUM

Brett Santee underwent a below-the-knee amputation to his right leg on November 30, 2005.  At that time, he was serving a prison sentence in the Federal Correctional Institution at Lewisburg, Pennsylvania ("USP Lewisburg").  The issue in this case of ordinary negligence[1] is to what extent did the United States' failure to care for Santee's diabetes cause or contribute to the amputation of his right leg.  Because Plaintiff has failed to prove all elements of an ordinary negligence claim, judgment will be entered in favor of the United States.

## I. Factual Background

Santee self-surrendered to USP Lewisburg on March 10, 2005.  On that day, he was given an intake examination.  During the examination conducted by Physician's Assistant Luis Ramirez ("PA Ramirez") on March 10, 2005, he noted on Santee's Patient Problem List that Santee had a significant diagnosis of "obesity." The Patient Problem List also notes "Diabetes Mellitus, Type 2" as a significant diagnosis, but this entry was undated and was not in the handwriting of PA Ramirez.  Rather, the "Diabetes Mellitus, Type 2" notation

---

[1]    This ordinary negligence action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671-2680 by Plaintiff Kathleen Grundowski, as Administrator of the Estate of Brett Santee ("Santee"), against Defendant United States of America ("Defendant" or the "United States").

appears to be the writing of Physician's Assistant Ferdinand Allama ("PA Allama"), who examined Plaintiff on April 5, 2005 and April 7, 2005.  On April 7, 2005, Santee's blood sugar was found to be 235 mg/dL, which is clear evidence of diabetes.  His blood sugar on April 12, 2005 was 237 mg/dL.  On April 14, 2005, PA Ramirez noted that Santee had mild pulsations in his feet.  Santee also saw PA Allama on April 26, 2005, at which time his blood sugar, or glucose level, was 292 mg/dL.  On that day, Santee was prescribed glyburide, a diabetes medication, and he was informed of an application for special shoes to treat his foot ulcers.

Also germane to this history is that Plaintiff had two toes amputated on his right foot before he arrived at USP Lewisburg.  According to Gerard Foti, D.O., the amputations performed in 2002 and 2004 were necessitated by osteomyelitis.  There is no mention of Type II Diabetes Mellitus in Dr. Foti's records.

At the intake screening on March 10, 2005, PA Ramirez noticed the toe amputations, and in response to his inquiry, Santee told him that they were due to osteomyelitis.  PA Ramirez was also told by Santee that he took no medication.  On April 1, 2005, PA Ramirez documented that Santee had peripheral neuropathy with possible circulatory problems.  Despite this condition being consistent with diabetes, no blood glucose level was taken.

On April 5, 2005, PA Allama examined Santee and documented that Santee had recently developed open blisters on his left big toe.  Two days later, Santee's blood glucose was checked for the first time, which was documented to be 235 mg/dL.  Later readings were as previously noted.  It is clear that, at the very least, Santee's diabetic condition was known, or should have been known, on April 7, 2005.  And, it is probable that blood glucose tests, if conducted between the intake screening on March 10, 2005 and April 7, 2005, would have indicated diabetes.

Although Santee was diabetic on April 7, 2005, and confirmed on April 12, 2005 and April 26, 2006, no diabetes medication was prescribed for him until April 26, 2005.  Santee continued to develop blisters and ulcers on his feet, and he had four hospitalizations for those conditions on June 21, 2005, August 29, 2005, September 30, 2005, and November

29, 2005. Ultimately, on November 30, 2005, Santee underwent a below-the-knee right leg amputation.

Should the United States bear responsibility for the ultimate amputation of Santee's right leg? From Santee's big right toe amputation in 2002 and his second right toe amputation in 2004, to the below-the-knee amputation on November 30, 2005, it can certainly be said that: (1) Santee should have been tested for diabetes well in advance of losing his right second toe in 2004; (2) he should have been tested upon his arrival at USP Lewisburg in March of 2005; and (3) upon discovering his elevated glucose level on April 7, 2005, he should have been immediately provided diabetes medication. Nevertheless, after Santee's diabetic condition was known on April 7, 2005, USP Lewisburg Staff failed to follow the recommendations set forth in the Federal Bureau of Prisons Clinical Practice Guidelines for Diabetes, September 2002 edition ("Practice Guidelines"), which were followed by USP Lewisburg in 2005. As a result, no baseline assessment of Santee's diabetic condition was conducted and Santee was not prescribed glyburide, a diabetes medication, until April 26, 2005, and attempts to fit Santee for special shoes were not made until May 13, 2005. In light of these facts, the ultimate inquiry for the Court is what was Defendant's role in causing Santee's below-the-knee right leg amputation? Stated differently, in this case of ordinary negligence,[2] did the United States' breach a legal duty

---

[2]     As detailed below, Plaintiff is proceeding solely on a theory of ordinary negligence, as her claim for medical malpractice/professional negligence was dismissed for failure to timely file a Certificate of Merit. (Docs. 44; 61.) Although the distinction between ordinary negligence and medical malpractice may be subtle, *see Grossman v. Burke*, 868 A.2d 561, 569 (Pa. Super. 2005), it has a profound impact on the Court's determination of the United States' liability in this case. As evidence predicated "upon facts constituting medical treatment . . . involv[ing] diagnosis, care, and treatment by licensed professionals, . . . must be characterized as [evidence of] professional negligence," *Ditch v. Waynesboro Hosp., 917 A.2d 317, 322 (Pa. Super. 2007) (quoting Yee v. Roberts*, 878 A.2d 906, 912 (Pa. Super. 2005)), the Court, for the most part, cannot rely on evidence of the improper medical determinations, *i.e.*, inaccurate or incorrect medical diagnosis or treatment of Santee's diabetes, to find the United States' liable for ordinary negligence. However, the Court can properly consider evidence of the

owed to Santee, and, if so, was the United States the factual cause of Santee's injury?

These issues were presented to the Court in a non-jury trial on April 12, 2012. At the conclusion of the trial, the parties were permitted to submit supplemental proposed findings of fact and conclusions of law. Both parties have done so. (Docs. 120; 121.) The Court, having now considered the testimony of witnesses and evidence admitted at trial, as well as the submissions of the parties, will analyze the evidence and the law and make Findings of Fact and Conclusions of Law as required by Rule 52 of the Federal Rules of Civil Procedure.

## II. Procedural History

Santee commenced this action against Defendant for professional negligence on December 5, 2007. (Doc. 1.) After Defendant moved to dismiss the Complaint because Plaintiff failed to timely file a Certificate of Merit ("COM"), Magistrate Judge Blewitt, on May 8, 2008, issued a Report and Recommendation that the United States' motion be denied. (Doc. 19, 24.) On September 30, 2008, after Defendant objected to Magistrate Judge Blewitt's recommendations, Judge Nealon rejected in part and adopted in part the Magistrate Judge's recommendations. (Doc. 23.) Specifically, Judge Nealon concluded that Plaintiff's Complaint involved a professional malpractice claim which required Plaintiff to file a COM, but the Court held in abeyance Defendant's motion to dismiss pending the Magistrate Judge's recommendation as to whether Plaintiff should be excused for failing to file a timely COM. (Doc. 24, 9-10.)

---

United States' errors in medical care to the extent that USP Lewisburg's staff failed to follow prison guidelines or care for an inmate with a known diabetic condition but for which treatment had not yet commenced. The Court can properly consider this evidence because failing to provide *any care for an inmate's known diabetic condition* does not involve a question of "medical judgment beyond the realm of common knowledge and experience." *Ditch*, 917 A.2d at 322. Thus, evidence that Defendants failed to provide any treatment for Santee's diabetic condition from the date of diagnosis, April 7, 2005, until the date treatment commenced, April 26, 2005, or evidence that Defendant failed to conduct a baseline assessment of an inmate's known diabetic condition, can be considered by the Court in evaluating Plaintiff's claim of ordinary negligence.

On January 14, 2009, Magistrate Judge Blewitt issued a supplemental Report and Recommendation recommending Defendant's motion to dismiss be granted for Plaintiff's failure to file a timely COM. (Doc. 40, 17.)  The Magistrate Judge also recommended that Plaintiff be denied the opportunity to assert a simple negligence claim. (Doc. 40, 16.)  The proposed simple negligence claim rejected by Magistrate Judge Blewitt was described by Plaintiff as follows:

> Santee's primary theory of negligence was that the prison personnel denied Santee **access** to his medication, which was already prescribed for him by his physician. (See e.g. Doc. 1 at ¶¶ 16 & 35) Santee's secondary theory of negligence was that he was denied proper shoes.  Absolutely no professional judgment was exercised in denying Santee shoes that fit him.  Santee's third theory of negligence was that he was denied reasonable and timely access to outside medical treatment.  (See id. at ¶¶ 29 & 39).  Santee was denied *access*, *contact*, and *communication* with medical care providers that were outside the confines of a prison.

(Doc. 32, 12 n.2) (emphasis in original).

On March 24, 2009, Judge Nealon adopted Magistrate Judge Blewitt's recommendation to dismiss Plaintiff's Complaint alleging professional negligence. (Doc. 44, 30.)  However, because Plaintiff's Complaint provided Defendant adequate notice that Plaintiff was alleging that the prison employees' negligence caused Santee's injuries, Judge Nealon concluded that "Plaintiff's ordinary negligence claim . . . relates back to Plaintiff's original pleading, pursuant to Fed. R. Civ. P. 15(c), and Plaintiff will be granted leave to amend his complaint." (Doc. 44, 30.)  Specifically, Judge Nealon reasoned:

> Plaintiff, in his original pleading, supplied a basis for this breach *by alleging that certain employees of Defendant denied Plaintiff his prescribed medication, that they denied Plaintiff access to outside medical care and treatment, that they were negligent in hiring and retaining personnel, and that Plaintiff was denied properly fitting boots which may have been a factor in the subsequent amputation*. . . . If the amended pleading, alleging ordinary negligence, as opposed to professional negligence, stems from the same incident and a common core of operative facts and Defendant will not be prejudiced as the original pleading gave Defendant ample notice of the claims against it, Plaintiff should be permitted to amend his pleading to allege simple negligence.

(Doc. 44, 27-28) (emphasis added).

Plaintiff subsequently filed an Amended Complaint, asserting a single claim for negligence. (Doc. 45.)   After Defendant filed a motion to dismiss and for summary

judgment, Magistrate Judge Blewitt recommended that the motion to dismiss be granted in part and denied in part. (Doc. 55, 18.) In particular, Magistrate Judge Blewitt recommended dismissal of Plaintiff's allegation that Defendant was negligent in hiring and/or retaining employees. (Doc. 55, 18.) The Magistrate Judge, however, noted that the Court had "already found a basis for the breach of an ordinary duty of care owed by [BOP] employees can be made based on certain employees of Defendant denying Plaintiff's prescribed medications, denying Plaintiff access to outside medical care and treatment, . . . and denying Plaintiff properly fitting boots as causing an amputation." (Doc. 55, 17.)

On January 19, 2010, Judge Nealon adopted the Magistrate Judge's recommendation in its entirety. (Doc. 61, 10.) Despite Defendant's argument that denial of medical prescriptions and outside medical care and treatment are "classic professional negligence claims," Judge Nealon reasoned that "prison staff preventing a prisoner from receiving prescribed medication and preventing a prisoner access to outside medical care can also be theories of ordinary negligence." (Doc. 61, 9.) Thus, Plaintiff was permitted to proceed to discovery.[3]

On April 12, 2012, the Court conducted a non-jury trial on Plaintiff's claim of ordinary negligence. At the close of Plaintiff's case, Defendant moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The Court, however, declined to render judgment until the close of the evidence. Now, as both parties have filed supplemental briefs and the time to file post-trial briefs has expired, the Court reaches the conclusions detailed below.

### III. Discussion

**A.    Legal Standard**

Rule 52 of the Federal Rules of Civil Procedure provides, in pertinent part:

(a) **Findings and Conclusions.**

---

[3]     On June 28, 2010, the Court granted Plaintiff's Unopposed Motion to Substitute Kathleen Grundowski as the proper party Plaintiff. (Doc. 72.)

(1) **In General.**  In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its legal conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.  Judgment must be entered under Rule 58.

. . .

(c) **Judgment on Partial Findings.**  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgement on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52.  Pursuant to Rule 52(a), the Court's decision must "be supported by subordinate factual findings." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969)).  As to a Rule 52(c) motion, the Court should apply "the same standard of proof and weigh the evidence as it would at the conclusion of the trial." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 272 (3d Cir. 2010) (citing *Emerson Elec. Co. v. Farmer*, 427 F.2d 1082, 1086 (5th Cir. 1970); *Falter v. Veterans Admin.*, 632 F. Supp. 196, 200 (D. N.J. 1986)).  While the Court is not permitted to "view the evidence through a particular lens or draw inferences favorable to either party," *Clark Bldg.*, 618 F.3d at 272 (citing *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006); *Giant Eagle, Inc. v. Fed. Ins. Co.*, 884 F. Supp. 979, 982 (W.D. Pa. 1995)), the Court should "make determinations of witness credibility where appropriate." *Clark Bldg.*, 618 F.3d at 273 (citing *Parker v. Long Beach Mortg. Co.*, 534 F. Supp. 2d 528, 535 (E.D. Pa. 2008); *Falter*, 632 F. Supp. at 200).

**B.    Negligence**

As set forth above, Plaintiff argues that the United States, through the conduct of the USP Lewisburg staff, was negligent in the safekeeping and care of Santee while he was incarcerated at USP Lewisburg.  Plaintiff's claim of ordinary negligence against the United States is brought under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. § 1346. Under the FTCA, sovereign immunity is waived for personal injuries "caused by the

negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . . " *Id*. "In applying a claim under the FTCA, [the Court must] apply the law of the state in which the act or omission occurred." *Hodge v. United States Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir. 2010) (citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 179 (3d Cir. 2000)).  As Defendant's acts or omissions all occurred in Pennsylvania, Pennsylvania negligence law will be applied to Plaintiff's claim.

To establish a negligence claim under Pennsylvania law, Plaintiff must establish four elements: (1) the United States owed a duty of care to Santee; (2) the United States breached that duty; (3) the breach caused Santee's injuries; and (4) Santee suffered actual loss or damage. *See Martin v. Evans*, 551 Pa. 496, 502, 711 A.2d 458, 462 (1998) (citing *Reilly v. Tiergarten Inc.*, 430 Pa. Super. 10, 14, 633 A.2d 208, 210 (Pa. Super. 1993)).

Here, pursuant to 18 U.S.C. § 4042, Defendant owed a statutory duty of care to Santee.  Section 4042 provides, in pertinent part, that:

> The Bureau of Prisons . . . shall-
> . . .
>
> (2) provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States . . . ;
>
> (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

18 U.S.C. § 4042(a)(2),(3).  "The duty of care as provided by 18 U.S.C. § 4042 is that of ordinary diligence to keep prisoners safe from harm." *Hossic v. United States*, 682 F. Supp. 23, 25 (M.D. Pa. 1987).  Because "it is unreasonable to expect that authorities can make a penitentiary a risk-free institution. . . .'[T]he duty imposed upon a jailer vis a vis his prisoner is to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him.'" *Turner v. Miller*, 679 F. Supp. 441, 443 (M.D. Pa. 1987) (citing *Walker v. United States*, 437 F. Supp. 1081, 1082 (D. Or. 1977); *Hossic*, 682 F. Supp. at 25).  As Santee was incarcerated at USP Lewisburg, the United States owed a general duty to provide for the safekeeping, care, and protection of Santee.

Nevertheless, despite the fact that the United States owed Santee a legal duty, Plaintiff is only entitled to recover if she can prove that the United States breached this duty of care, causing Santee's injuries and resulting damages. *See McClelland v. United States*, No. 8-851, 2010 WL 2978083, at *5 (W.D. Pa. July 26, 2010) (citing *Swift v. Ne. Hosp. of Philadelphia*, 456 Pa. Super. 330, 690 A.2d 719, 722 (Pa. Super. 1997)).  And, to establish a breach of § 4042 in this case, Plaintiff may only rely on evidence indicative of ordinary negligence, and not evidence of professional negligence, as Plaintiff's medical malpractice claim has previously been dismissed. (Doc. 44.)  Stated differently, for Plaintiff to recover, she must show that the acts complained of are acts of ordinary negligence and not medical malpractice.

In conducting this inquiry, "a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Davis v. United States*, No. 07-0566, 2009 WL 890938, at *5 (M.D. Pa. Mar. 31, 2009) (citing *Smith v. Friends Hosp.*, 928 A.2d 1072, 1075-76 (Pa. Super. 2007)).  When evidence is predicated "upon facts constituting medical treatment . . . involv[ing] diagnosis, care, and treatment by licensed professionals," the evidence "must be characterized as [evidence of] professional negligence." *Ditch v. Waynesboro Hosp., 917 A.2d 317, 322 (Pa. Super. 2007) (quoting Yee v. Roberts*, 878 A.2d 906, 912 (Pa. Super. 2005)).  As noted by the Third Circuit, "a complaint 'sounds in malpractice' where 'the conduct at issue constituted an integral part of the process of rendering medical treatment.'" *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007) (quoting *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 323 (Pa. Super. 2007)).[4]

---

[4]     As facts relating to a medical diagnosis by medical professionals are evidence of professional negligence, Defendant's incorrect original diagnosis of Santee, which attributed his foot problems to osteomyelitis and not diabetes, is evidence of medical malpractice and not ordinary negligence.  In any event, the

Courts of the Third Circuit, in limited circumstances, have recognized that certain acts or omissions by prison medical staff can constitute a breach of an ordinary negligence duty. For example, the denial of an inmate's prescribed medication does not involve an issue of medical judgment, and, therefore, can constitute a breach of the United States's ordinary legal duty. *See Jones v. United States*, 91 F.3d 623, 625 (3d Cir. 1996). Similarly, the denial of access to medical treatment by medical staff has been determined to constitute an act of ordinary negligence. *See Hill v. Lamanna*, No. 03-323, 2006 WL 2433773, at *9 (W.D. Pa. Aug. 18, 2006). Additionally, this Court has previously determined that the failure to provide proper clothing and shoes can be a breach of the ordinary duty of care. (Doc. 44.)

The third element a plaintiff must prove in Pennsylvania to succeed on a negligence claim is that the defendant was a factual cause[5] of the plaintiff's injuries. *Harris v. Kellogg, Brown, & Root Serv., Inc.,* 796 F. Supp. 2d 642, 658 (W.D. Pa. 2011). "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." Pa. SSJI (Civ), § 3.15. However, "[t]o be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as [his or her] own

---

reasonableness of this diagnosis by USP Lewisburg staff is aided by: (1) the fact that Santee was not prescribed diabetes medication upon his arrival at USP Lewisburg; (2) Santee's repeated statements to USP Lewisburg staff that there was no history of diabetes in his family; (3) Santee's representations to USP Lewisburg staff that his toes were amputated because of osteomyelitis; and (4) Dr. Foti's records stating that Santee's toe amputations were necessitated by osteomyelitis.

[5]     The term "factual cause" has been adopted to replace the previously-used terms "substantial factor" and "legal cause." *Gorman v. Costello*, 929 A.2d 1208, 1213 n.7 (Pa. Super. 2007).

negligence is a factual cause of the injury." *Id*.  And,

> [w]here the negligent conduct of a defendant combines with other circumstances and other forces to cause the harm suffered by the plaintiff, the defendant is responsible for the harm if [his or her] negligent conduct was a factual cause of the harm, even if the harm would have occurred without it.

Pa. SSJI (Civ), § 3.17.  The explanatory comments further provide that "[a] defendant cannot escape liability where his or her negligent conduct would have brought about the harm by itself simply because another force coincidentally would also have brought about the harm if acting alone." *Id*.

In limited circumstances, Pennsylvania law "permits recovery where a defendant's negligence increased the risk of harm to a plaintiff, even if plaintiff cannot show conclusively that no injury would have occurred in the absence of negligence." *Lempke v. Osmose Util. Servs., Inc.*, No. 11-1236, 2012 WL 94497, at *3 (W.D. Pa. Jan. 11, 2012).  "If the plaintiff can show an increased risk of harm, then the case may be submitted to a jury to determine whether the increased risk of harm was a substantial factor in causing the injury." *Id* (citing *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 n.1 (1990)).  Nevertheless, evidence of an increased risk of harm "*allows a jury to find that the conduct which gave rise to an increased risk was the legal cause of a plaintiff's injuries, but does not require the jury to do so.*" *Corrigan v. Methodist Hosp.*, 234 F. Supp. 2d 494, 501 (E.D. Pa. 2002) (citing *Clayton v. Sabeh*, 406 Pa. Super. 335, 594 A.2d 365, 367 (Pa. Super. 1991)) (emphasis added); *see also Fenney v. Disston Manor Pers. Care Home, Inc.*, 849 A.2d 590, 594 (Pa. Super. 2004) (applying increased risk theory of causation to ordinary negligence action against personal care home).  Thus, once a plaintiff establishes conduct giving rise to an increased risk of harm, that evidence provides the basis for a fact-finder to conclude that such increased risk was a substantial factor in bringing about the resultant harm "if the jury sees fit to find cause in fact." *Corrigan*, 234 F. Supp. 2d at 502 (citing *Clayton*, 594 A.2d at 367; *Hamil v. Bashline*, 481 Pa. 256, 269, 392 A.2d 1280, 1286 (1978)).

The final element a plaintiff must demonstrate to prevail on a negligence claim is that the breach of a legal duty caused the plaintiff to suffer harm. *See Krentz v. Consolidated Rail*

*Corp.*, 589 Pa. 576, 588, 910 A.2d 20, 28 (2006).  Thus, "the plaintiff [must have] incurred actual loss or damage." *Id* (citing *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003)).

A plaintiff that proves a *prima facie* case of negligence, however, may have his or her recovery reduced or eliminated under Pennsylvania's comparative negligence scheme. "Pennsylvania law employs a comparative negligence regime whereby a plaintiff is not barred from recovery based on his or her own contributory negligence 'where such negligence is not greater than the causal negligence of the defendant or defendants against whom recovery is sought.'" *Harris*, 796 F. Supp. 2d at 658 (quoting 42 Pa.C.S. § 7102(a)). As a result, "if the negligence of [Santee] was greater than the negligence, if any, of the [United States], Plaintiff cannot recover." *Estate of Possinger v. United States*, 351 F. App'x 694, 696 (3d Cir. 2009) (citing *Elder v. Orluck*, 511 Pa. 402, 515 A.2d 517, 525 (1986)).

The parties now dispute which acts or omissions of USP Lewisburg staff can be considered acts of ordinary, as opposed to professional, negligence.  It is undisputed that Plaintiff asserts ordinary negligence for the alleged denial of (1) prescribed medication, (2) access to outside medical care, and (3) properly fitting shoes.  The United States argues that these are the only theories remaining in this action.  Conversely, Plaintiff argues that other than the theories of destruction of medical records and negligent hiring/chain of command, all other allegations initially set forth in Plaintiff's Complaint are viable claims in this case.  Although the Court has previously indicated that Plaintiff could proceed in this case on the three theories as argued by the United States, the Court agrees with Plaintiff that the Court did not expressly limit this case to those three theories alone.  Particularly, in Plaintiff's First Amended Complaint, allegations that were not dismissed by the Court and that do not relate to the denial of properly fitting shoes, prescribed medication, or outside treatment include the "failing to provide for the safekeeping and care of the Plaintiff" and "violating the various written and unwritten policies, procedures, protocols and/or guidelines applicable to the care and treatment of inmates in its care." (Doc. 45, ¶ 61 r,v.)  Essentially, these claims relate to the United States' purported failure to provide any care for Santee's

known diabetic condition, which the Court has classified as a theory of general negligence. Even though these alternative theories were not dismissed by the Court previously, Plaintiff may only recover if she made a sufficient showing of ordinary negligence- and not negligence relating to the diagnosis, medical judgment, or medical treatment applied in caring for Santee- as to this theory of negligence.  The Court will address each of Plaintiff's theories of negligence in turn.

### 1.   Denial of Prescribed Medication

Plaintiff presented no evidence that Santee was denied access to previously prescribed medication when he arrived at USP Lewisburg.  In particular, in November and December of 2004, and March of 2005, Santee was examined by Dr. Foti, and none of Dr. Foti's records indicate that Santee was prescribed medication for diabetes at those times. And, upon his arrival at USP Lewisburg on March 10, 2005, Santee informed PA Ramirez that he was not taking any medications.  Moreover, throughout his time at USP Lewisburg, Plaintiff offered no convincing evidence that Santee was prescribed medication, but USP Lewisburg staff denied Santee access to these prescriptions.  Plaintiff therefore has failed to prove a denial of access to prescribed medication claim.[6]

### 2.   Denial of Access to Outside Medical Care

Plaintiff presented no evidence that Santee was denied access to outside medical care.  Specifically, the evidence presented by Plaintiff shows that Santee was sent for outside  medical care to Evangelical Hospital numerous times, including in June, August, September, and November of 2005.  During these visits, Santee frequently stayed in the hospital for multiple days.  Moreover, Plaintiff presented no evidence that Santee requested USP Lewisburg staff to send him for outside medical care and his request was denied, or

---

[6]     To the extent that Plaintiff's evidence establishes that USP Lewisburg staff failed to properly diagnose Santee and provide appropriate medication for his diabetes once diagnosed, this is evidence constituting an integral part of medical treatment, which sounds in professional negligence, and is not proof of Plaintiff's claim of ordinary negligence.

that the necessity of outside care was known by USP Lewisburg staff, but that access to outside care was nevertheless denied.  As Plaintiff has presented no evidence that Santee was denied access to outside medical care, Plaintiff has failed to establish that Defendant breached a legal duty owed to Santee.  Accordingly, Plaintiff has failed to prove her denial of access to outside medical care theory of negligence.[7]

### 3.    Denial of Properly Fitting Footwear or Special Shoes

Plaintiff presented no evidence that Santee was denied properly fitting footwear.  The evidence demonstrates that prior to entering USP Lewisburg on March 10, 2005, Santee was not prescribed any special footwear.  And, shortly thereafter, Santee was provided with size 15 boots.  As Plaintiff presented no evidence that these boots did not fit Santee or that he should have been provided with different sized boots, Plaintiff has failed to prove her denial of properly fitting footwear theory of negligence.

Moreover, Plaintiff did not prove her claim of negligence relating to Defendant's conduct in regard to providing Santee special shoes.  As noted, Santee's diabetic condition was known, or should have been known, by USP Lewisburg staff on April 7, 2005.  Approximately three (3) weeks thereafter, on April 26, 2005, Santee was educated about wound care and application of a surgical boot by PA Allama.  On May 11, 2005, Santee was informed that a new compression stocking would need to be fitted, but on May 13, 2005, Santee failed to show for the fitting for the compression stocking.  Santee was provided with a special shoe before June 3, 2005 as Santee was advised on that day by Dr. Motto "to wear the special shoes provided to previously."

Plaintiff has not established that Defendant's failure to provide special shoes between April 7, 2005, the date with which Santee's diabetic condition should have been known, and the date he was provided with special shoes was a factual cause of his right leg

---

[7]     To the extent that Plaintiff's evidence establishes that USP Lewisburg staff erred in not sending Santee for outside medical care with greater frequency, such evidence constitutes evidence of medical judgment integral to the treatment process, which is an issue of medical malpractice and not ordinary negligence.

amputation.   In addition, Plaintiff failed to establish that Defendant acted unreasonably when it first attempted to fit Santee for a special shoe approximately five (5) weeks after his diabetic condition was known.

Initially, although the Practice Guidelines provide that standard issue work shoes generally addresses most concerns of diabetic inmates, the Practice Guidelines also recommend that an inmate with a history of plantar ulcer should be provided with an extra depth shoe and may need a custom-made shoe.   According to Plaintiff's expert, Dr. Kenneth J. Sebastianelli, M.D, the failure of USP Lewisburg staff to fit Santee for a special shoe on the day he entered prison "increased the risk" by eighty-five (85) percent that Santee would ultimately require a leg amputation.   However, increased risk evidence is not conclusive evidence that Defendant was a factual cause of Santee's below-the-knee right leg amputation.   And, as the evidence demonstrates that Santee was provided with special shoes approximately five (5) to eight (8) weeks after his diabetic condition became known to USP Lewisburg staff, Plaintiff has failed to prove that Defendant was a factual cause of Santee's injuries.

Plaintiff also failed to prove that Defendant acted unreasonably or in breach of its legal duty.   Specifically, the evidence demonstrates that Defendant (1) informed Santee of the application for special shoes three (3) weeks after his diabetic condition became known and (2) that Defendant attempted to fit Santee for special shoes five (5) weeks after his diabetic condition became known.   Based on this evidence, Defendant acted reasonably in providing care for Santee in regard for his need for special shoes.   Plaintiff has therefore failed to prove her claim of negligence on the denial of special footwear theory.

### 4.       General Failure to Protect Santee

Plaintiff has failed to present sufficient evidence to recover on her general claim of negligence related to Defendant's failure to care for Santee and follow the Practice Guidelines.   As previously set forth, pursuant to 18 U.S.C. § 4042, Defendant had a duty to act reasonably in caring for Santee and his known medical conditions.   As a result, Defendant was obligated to act reasonably in caring for Santee's diabetic condition

beginning on April 7, 2005 when Santee's blood sugar was recorded by PA Allama as 235 mg/dL.

And, Defendant, through the conduct of USP Lewisburg staff, breached this legal duty to Santee when it waited until April 26, 2005 to actively care for Santee's diabetic condition.  Included in Defendant's breach of the duty of reasonable care between April 7, 2005 and April 26, 2005 was USP Lewisburg's staff's failure to conduct an initial baseline assessment as recommended by the Practice Guidelines.

According to the evidence presented at trial, however, the last day Defendant breached its duty of ordinary care in regard to Santee's diabetes occurred on April 26, 2005.  As of that day, Defendant began to actively care and treat Santee's diabetes, which included: (1) prescribing glyburide, a diabetes medication, for Santee; (2) educating Santee of proper wound care; and (3) informing Santee of an application for special shoes.  Thus, once Defendant commenced treatment of Santee, evidence of insufficient or improper treatment relates to an integral part of Santee's medical care- which is proof of professional negligence, and not ordinary negligence.  Accordingly, evidence of the inadequacies of Santee's treatment after April 26, 2005 is not supportive of Plaintiff's claim for ordinary negligence.

Despite the fact that Plaintiff has established that Defendant breached the duty of care owed to Santee from April 7, 2005 until April 26, 2005, Plaintiff has nevertheless failed to prove that Defendant was the factual cause of Santee's injuries.  Specifically, Plaintiff's causation testimony provided by Dr. Sebastianelli indicated that Defendant's failure to follow the Practice Guidelines upon Santee's arrival at USP Lewisburg increased the risk that Santee would ultimately need an amputation.  Evidence of an increased risk of harm, however "allows a jury to find that the conduct which gave rise to an increased risk was the legal cause of a plaintiff's injuries, but does not require the jury to do so." *Corrigan v. Methodist Hosp.*, 234 F. Supp. 2d 494, 501 (E.D. Pa. 2002) (citing *Clayton v. Sabeh*, 406 Pa. Super. 335, 594 A.2d 365, 367 (Pa. Super. 1991)).  In light of Santee's previous foot problems and toe amputations dating back to 2002, as well as the fact that Santee was not

16

prescribed medication for diabetes from at least November of 2004 until April of 2005, Defendant's lack of proper care of Santee's diabetes for three weeks in April of 2005 was not a factual cause of Santee's injuries.   Based on Santee's apparent untreated and uncontrolled diabetic condition for months prior to his incarceration at USP Lewisburg, the Court cannot conclude that the United States caused Santee's below-the-knee right leg amputation.   Instead, Defendant's negligence only increased the risk that Santee would suffer harm, without being a cause of Santee's injuries.  As such, Plaintiff has failed to prove that Defendant's general failure to care and follow the Practice Guidelines caused Santee's injuries.[8]

## IV. Conclusion

For the above stated reasons, judgment will be entered for Defendant and against Plaintiff.  The Court's Findings of Fact and Conclusions of Law, as required by Federal Rule of Civil Procedure 52, are as follows:

### Findings of Fact

1.  On November 3, 2004, Santee was thirty-two (32) years old.  Santee was born on April 6, 1972.

2.  On November 3, 2004, Dr. Gerard Foti conducted a medical examination of Santee's right third toe osteomyelitis.

3.  Prior to this examination, Santee's right great toe and second toe had been amputated due to osteomyelitis.

4.  At this time, Santee was not taking any medication for diabetes or infection.

5.  On November 9, 2004, November 11, 2004, November 23, 2004, and

---

[8]      Much of the evidence set forth by Plaintiff was indicative of the adequacy of the care provided by USP Lewisburg staff in *treating* Santee's diabetic condition after he was diagnosed and treatment commenced for his Type II Diabetes Mellitus. Such evidence, however, implicates issues of medical judgment and errors in medical treatment, *i.e.* professional negligence, which, as noted, is no longer an issue in this case.  Plaintiff, therefore, has failed to prove a *prima facie* claim of ordinary negligence on the general failure to care theory of negligence.

December 21, 2004, Dr. Foti conducted follow up examinations of Santee's right third toe osteomyelitis.

6. On each of these four occasions, Santee was not taking medication for diabetes.

7. On December 21, 2004, Dr. Foti's records indicate that Santee had an ulcer on his right foot that was painful, but healing.

8. On March 1, 2005, Dr. Foti conducted an examination of Santee's right fourth toe.

9. At this time, Santee was not taking medication for diabetes or infection, nor was he wearing special shoes.

10. Santee arrived as a self surrenderer to USP Lewisburg on March 10, 2005.

11. On that same day, Santee was interviewed by Health Services as part of the inmate intake screening process.

12. The screening was conducted by Physician's Assistant Luis Ramirez.

13. As part of the intake screening, PA Ramirez noted that Santee had previously had his right big toe and second toe amputated due to osteomyelitis.

14. PA Ramirez also entered a notation on March 10, 2005 on a Patient Problem List indicating that Santee had a significant diagnosis of "obesity."

15. The Patient Problem List also contains a notation that Santee suffered from "Diabetes Mellitus Type 2."

16. No date is noted next to the "Diabetes Mellitus Type 2" notation.

17. The "Diabetes Mellitus Type 2" notation was not written by PA Ramirez.

18. Instead, the "Diabetes Mellitus Type 2" notation was added to the Patient Problem List at some time thereafter by Physician's Assistant Ferdinand Allama.

19. As part of the screening process, Santee was also required to complete a Medical History Report.

20. The Medical History Report indicates that Santee was not taking any

medication for diabetes when he arrived at USP Lewisburg.

21. The Medical History Report also shows that Santee never had sugar or albumin in his urine.

22. USP Lewisburg policy was that newly arrived inmates should undergo a physical examination within fourteen (14) days after arrival.

23. On April 1, 2005, Santee was transferred to the USP Lewisburg satellite camp.

24. Santee's physical was conducted on April 1, 2005,  approximately three (3) weeks after his arrival to USP Lewisburg.

25. At Santee's physical, he denied a history of family diabetes and indicated that his right big toe and second toe were amputated due to osteomyelitis.

26. PA Ramirez also noted that Santee had light pedal pulses which can be attributed to a number of causes, including, but not limited to, circulatory problems, weight problems, and diabetes.

27. On April 5, 2005, Santee returned to Health Services for medical treatment and was examined by PA Allama.

28. April 5, 2005 marked the first recorded examination of Santee by PA Allama.

29. On that day, Santee complained of an open blister in his left big toe that he noticed the previous day, but was not present when PA Ramirez conducted his physical examination on April 1, 2005.

30. This was the first medical record indicating Santee had an open blister on his left foot.

31. PA Allama noted that the blister was not infected, treated the blister, and informed Santee to return if there was a problem and for daily dressing changes.

32. Santee returned to the sick hall for treatment on April 7, 2005.

33. On that day, PA Allama noted that Santee's left big toe was infected and ordered him to return for daily dressing changes.

19

34.   PA Allama performed a Random Blood Sugar Test on April 7, 2005.

35.   Santee's blood sugar was documented by PA Allama to be 235 mg/dL.

36.   An individual with a random blood sugar level above 180 mg/dL is considered a diabetic range.

37.   PA Allama noted that Santee might have Diabetes Mellitus due to his history of toe amputations and ordered him to return for daily dressing changes.

38.   As of this date, prison staff knew, or should have known, that Santee suffered from Type II Diabetes Mellitus.

39.   On April 12, 2005, Santee's glucose level was 237 mg/dL.

40.   Santee next returned for medical treatment for his big toe ulcer on April 14, 2005.

41.   Santee was treated by PA Ramirez on April 14, 2005, and PA Ramirez noted that Santee was prescribed medicine on April 7, 2005, but Santee never returned to pick up the prescription.

42.   PA Ramirez prescribed antibiotics to Santee until the results of his wound culture were completed.

43.   On April 14, 2005, PA Ramirez ordered Santee to return for treatment as needed.

44.   On April 20, 2005, Santee completed a Dental/Medical History form.

45.   On the Dental/Medical History form, Santee did not identify a prior diagnosis of diabetes.

46.   Santee returned for treatment on April 25, 2005.

47.   PA Ramirez treated Santee on April 25, 2005 and prescribed antibiotics for Santee's infected ulcers present on both of his feet.

48.   PA Ramirez ordered Santee to return for treatment as needed.

49.   The next day, on April 26, 2005, Santee returned to the sick hall.

50.   PA Allama gave Santee a Random Blood Sugar Test that day, and Santee's blood sugar was 292 mg/dL.

51.  PA Allama noted that Santee "is known to have Diabetes Mellitus Type 2."

52.  Santee was prescribed glyburide, a medicine for Type II diabetes, on April 26, 2005, and he was also informed of proper wound care techniques and that an application for special shoes would be made.

53.  Santee's treatment for diabetes commenced nineteen (19) days after USP Lewisburg staff knew, or should have know, that Santee suffered from Type II Diabetes Mellitus.

54.  On May 11, 2005, Santee was examined by Dr. Stefan.

55.  Dr. Stefan indicated that Santee had a diabetic foot ulcer and should be fitted for a compression stocking.

56.  On May 13, 2005, Dr. Bussanich charted that he placed two (2) call-outs for Santee for purposes of fitting him for the compression stocking, but Santee failed to show both times

57.  Santee next returned to the medical clinic on June 3, 2005, and he was examined by Dr. Motto.

58.  Dr. Motto advised Santee that he should wear the special shoes that he was previously provided.

59.  On June 21, 2005, Santee returned to the medical center and was examined by Physician's Assistant Samuel Gosa ("PA Gosa"), who noted that Santee's sock was soaked with foul smelling purulent drainage.

60.  At that time, Santee was sent to the emergency room at Evangelical Hospital for further evaluation.

61.  Santee returned for treatment at various times throughout July and August of 2005 for supplies for dressing changes.

62.  On August 29, 2005, Santee was again admitted to Evangelical Hospital.

63.  Upon admission to Evangelical Hospital, Santee informed the staff of a family history positive for diabetes mellitus in his father.

64.  On September 8, 2005, an administrative note in Evangelical Hospital's

records indicated that Santee was being fitted for an orthopedic shoe.

65. Santee was also being prescribed Metformin for his diabetes in September of 2005.

66. On September 9, 2005, a three (3) month supply of Metformin was ordered and called to the pharmacy for Santee.

67. Santee was again admitted to Evangelical Hospital for treatment from September 30, 2005 until October 7, 2005.

68. On October 2, 2005, Santee was evaluated at Evangelical Hospital and informed hospital staff that "he was unable to receive this medication [Metformin] consistently in the outpatient setting."

69. On October 6, 2005, Dr. Bussanich indicated concern with Santee's condition based on Santee's hygiene and failure to comply with medication and diet orders.

70. In late October of 2005, after Santee was released back to USP Lewisburg, Santee was examined by PA Gosa, who twice noted that Santee was compliant with his medications.

71. On November 29, 2005, Santee reported to sick hall to have his right foot checked.

72. PA Allama recorded that the previous night a substantial amount of exudates came out of Santee's right foot and PA Allama observed that the dressing was wet.

73. PA Allama also noted that he "notified urgently Dr. Bussanich for further management to outside hospital."

74. Santee was admitted to Evangelical Hospital's Emergency Room on November 29, 2005.

75. The next day, on November 30, 2005, Santee underwent a below-the-knee amputation of his right leg.

76. In April of 2005, USP Lewisburg followed the Federal Bureau of Prisons

Clinical Practice Guidelines for Diabetes, September 2002 edition ("Practice Guidelines").

77. The purpose of the Practice Guidelines was to "provide recommendations for the medical management of Federal inmates with diabetes mellitus."

78. The Practice Guidelines recommend that a known diabetic be given an initial baseline assessment and provide that "a comprehensive medical history should be taken for all inmates diagnosed with diabetes by the evaluating clinician," which includes "review of prior or current infections, particularly involving the skin, feet, dentition, and genitourinary system."

79. The Practice Guidelines incorporate the Carville Foot Exam, which is a foot examination to determine if a diabetic has certain symptoms in order to aid in the prevention of foot ulcers.

80. An inmate with a risk categorization of 3 under the Carville Foot Exam has a history of plantar ulcer.

81. An inmate with a history of plantar ulcer, according to the Carville Foot Exam, will need extra depth shoes with soft molded inserts and may eventually need custom-made shoes after the ulcer is healed.

### Conclusions of Law

82. Plaintiff's claim of ordinary negligence against the United States is brought under the FTCA. *See* 28 U.S.C. § 1346.

83. Under the FTCA, sovereign immunity is waived for personal injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ." *Id*.

84. The FTCA provides that a court must apply the substantive law of the state where the tort occurred. *See id*.

85. In this case, the actions all occurred in Pennsylvania, and, therefore, the substantive law of Pennsylvania governs this action.

86.   To establish a negligence claim under Pennsylvania law, Plaintiff must establish four elements: (1) the United States owed a duty of care to Santee; (2) the United States breached that duty; (3) the breach caused Santee's injuries; and (4) Santee suffered an actual loss or damage. *See Martin v. Evans*, 551 Pa. 496, 502, 711 A.2d 458, 462 (1998) (citing *Reilly v. Tiergarten Inc.*, 430 Pa. Super. 10, 14, 633 A.2d 208, 210 (Pa. Super. 1993)).

87.   On March 10, 2005, Santee became an inmate at USP Lewisburg.

88.   As such, pursuant to 18 U.S.C. § 4042, Defendant owed a statutory duty of care to Santee.

89.   Section 4042 provides that the United States owes a duty to provide for the safekeeping, care, and protection of inmates, such as Santee. *See* 18 U.S.C. § 4042(a)(2).

90.   "The duty of care as provided by 18 U.S.C. § 4042 is that of ordinary diligence to keep prisoners safe from harm." *Hossic v. United States*, 682 F. Supp. 23, 25 (M.D. Pa. 1987).

91.   "'[T]he duty imposed upon a jailer vis a vis his prisoner is to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him.'" *Turner v. Miller*, 679 F. Supp. 441, 443 (M.D. Pa. 1987) (citing *Walker v. United States*, 437 F. Supp. 1081, 1082 (D. Or. 1977); *Hossic*, 682 F. Supp. at 25).

92.   Because Santee was an inmate at USP Lewisburg, Defendant owed him a duty of reasonable care to provide for his protection and safekeeping.

93.   As Plaintiff is proceeding on a theory of ordinary negligence alone, and not medical malpractice, Plaintiff may not rely on evidence of professional negligence to prove her case.

94.   "A complaint 'sounds in malpractice' where 'the conduct at issue constituted an integral part of the process of rendering medical treatment.'" *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007) (quoting *Ditch*

*v. Waynesboro Hosp.*, 917 A.2d 317, 323 (Pa. Super. 2007)).

95. To evaluate whether evidence is indicative of ordinary negligence or medical malpractice, "a court must ask two fundamental questions . . . : (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience." *Davis v. United States*, No. 07-0566, 2009 WL 890938, at *5 (M.D. Pa. Mar. 31, 2009) (citing *Smith v. Friends Hosp.*, 928 A.2d 1072, 1075-76 (Pa. Super. 2007)).

96. The denial of access to medical treatment by medical staff has been determined to constitute an act of ordinary negligence. *See Hill v. Lamanna*, No. 03-323, 2006 WL 2433773, at *9 (W.D. Pa. Aug. 18, 2006).

97. The denial of an inmate's prescribed medication does not involve an issue of medical judgment, and, therefore, can constitute a breach of the United States' legal duty pursuant to § 4042. *See Jones v. United States*, 91 F.3d 623, 625 (3d Cir. 1996).

98. And, this Court has previously determined that the failure to provide proper clothing and shoes can be a breach of the ordinary duty of care. (Doc. 44.)

99. Causation under Pennsylvania law is established by proving that Defendant is the factual cause of Santee's injuries. *See Harris v. Kellogg, Brown, & Root Serv., Inc.,* 796 F. Supp. 2d 642, 658 (W.D. Pa. 2011)

100. "Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm, even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no connection or only an insignificant connection with the harm." Pa. SSJI (Civ), § 3.15.

101. A defendant cannot escape liability for negligence where its conduct would

have brought about the harm by itself simply because another force coincidently would also have brought about the harm if acting alone. *See* Pa. SSJI (Civ), § 3.17.

102. In limited circumstances, Pennsylvania law "permits recovery where a defendant's negligence increased the risk of harm to a plaintiff, even if plaintiff cannot show conclusively that no injury would have occurred in the absence of negligence." *Lempke v. Osmose Util. Servs., Inc.*, No. 11-1236, 2012 WL 94497, at *3 (W.D. Pa. Jan. 11, 2012).

103. Evidence of an increased risk of harm "*allows a jury to find that the conduct which gave rise to an increased risk was the legal cause of a plaintiff's injuries, but does not require the jury to do so.*" *Corrigan v. Methodist Hosp.*, 234 F. Supp. 2d 494, 501 (E.D. Pa. 2002) (citing *Clayton v. Sabeh*, 406 Pa. Super. 335, 594 A.2d 365, 367 (Pa. Super. 1991)) (emphasis added).

104. The final element that Plaintiff must prove to recover is that Santee "incurred actual loss or damage," as a result of Defendant's negligence. *Id* (citing *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000, 1008 (2003)).

105. A plaintiff that proves a *prima facie* claim of negligence, however, may have his or her recovery reduced or eliminated under Pennsylvania's comparative negligence scheme.

106. "If the negligence of [Santee] was greater than the negligence, if any, of the [United States], Plaintiff cannot recover." *Estate of Possinger v. United States*, 351 F. App'x 694, 696 (3d Cir. 2009) (citing *Elder v. Orluck*, 511 Pa. 402, 515 A.2d 517, 525 (1986)).

107. Plaintiff's theories of negligence can be reduced to four categories: (a) denial of access to prescribed medication; (b) denial of access to outside medical care; (c) denial of special shoes or properly fitting boots; and (d) general negligence in failing to care for Santee or follow the Practice Guidelines.

**a.      Denial of Access to Prescribed Medication**

26

108. Plaintiff presented no evidence that Santee was denied access to previously prescribed medication when he arrived at USP Lewisburg.

109. In November and December of 2004, and March of 2005, Santee was examined by Dr. Foti, and Dr. Foti's records do not indicate that Santee was prescribed medication for diabetes.

110. On March 10, 2005, upon his arrival at USP Lewisburg, Santee informed PA Ramirez that he was not taking any medications.

111. Throughout his time at USP Lewisburg, Plaintiff's only evidence offered that he was denied access to prescribed medicine was his statement on October 2, 2005 that he was unable to receive Metformin consistently. Santee's statements are rebutted by the fact that a three (3) month supply of Metformin was provided to him less than a month earlier and PA Gosa's notes in late October of 2005 that Santee was compliant with his medications.

112. To the extent that Plaintiff's evidence establishes that USP Lewisburg staff failed to properly diagnose Santee and provide appropriate diabetes medication, this is evidence constituting an integral part of medical treatment, which sounds in medical malpractice, and is not evidence of a breach of an ordinary negligence duty.

113. As Santee was not denied prescribed diabetic medication, Plaintiff has not established that Defendant breached a legal duty by failing to provide Santee with diabetes medicine.

114. I therefore find for Defendant on Plaintiff's denial of prescribed medication theory of negligence.

**b.     Denial of Access to Outside Medical Care**

115. Plaintiff presented no evidence that Santee was denied access to outside medical care.

116. The evidence presented by Plaintiff shows that Santee was sent for outside medical care to Evangelical Hospital in June, August, September, and

November of 2005.

117. During these visits, Santee frequently stayed in the hospital for multiple days.

118. Plaintiff presented no evidence that Santee requested USP Lewisburg staff to send him for outside medical care and his request was denied.

119. Plaintiff similarly failed to present evidence that outside care was known by USP Lewisburg staff to be medically necessary, but that access to outside care was nevertheless denied.

120. To the extent that Plaintiff's evidence establishes that USP Lewisburg staff erred in failing to send Santee for outside medical care with greater frequency, such evidence is indicative of medical judgment integral to the treatment process, which is proof of medical malpractice and not ordinary negligence.

121. As Plaintiff has presented no evidence that Santee was denied access to outside medical care, Plaintiff has failed to establish that Defendant breached a legal duty owed to Santee.

122. I therefore find for Defendant on Plaintiff's denial of access to outside medical care theory of negligence.

**c.     Denial of Properly Fitting Footwear or Special Shoes**

123. Plaintiff presented no evidence that Santee was denied properly fitting footwear.

124. Prior to entering USP Lewisburg on March 10, 2005, Santee was not prescribed any special footwear.

125. Santee was provided with size 15 boots on March 31, 2005.

126. Plaintiff presented no evidence that these boots did not fit Santee or that he should have been provided with a different sized boot.

127. As such, I find for Defendant on Plaintiff's denial of properly fitting footwear theory of negligence.

128. Plaintiff also failed to present convincing evidence that the below-the-knee

amputation of Santee's right leg was caused by Defendant's failure to timely provide Santee with a special shoe.

129. Although the Practice Guidelines provide that standard issue work shoes generally addresses most concerns of diabetic inmates, the Practice Guidelines also recommend that an inmate with a history of plantar ulcer should be provided with an extra depth shoe and may need a custom-made shoe.

130. Santee's diabetic condition was known, or should have been known, by USP Lewisburg staff on April 7, 2005.

131. On April 26, 2005, Santee was educated about wound care and application of a surgical boot by PA Allama.

132. On May 11, 2005, Santee was informed that a new compression stocking would need to be fitted, but on May 13, 2005, Santee failed to show for the fitting for the compression stocking.

133. Santee was provided with a special shoe before June 3, 2005 as Santee was advised on that day by Dr. Motto "to wear the special shoes provided to previously."

134. Plaintiff has not established that Defendant's failure to provide special shoes between April 7, 2005, the date with which Santee's diabetic condition should have been known, and the date he was provided with special shoes was a factual cause of his right leg amputation.  Nor has Plaintiff established that Defendant acted with a lack of reasonable care when it attempted to fit Santee for a special shoe approximately five (5) weeks after his diabetic condition was known.

135. According to Plaintiff's expert, Dr. Kenneth J. Sebastianelli, the failure of USP Lewisburg staff to fit Santee for a special shoe on the day he entered prison "increased the risk" by eighty-five (85) percent that Santee would ultimately require a leg amputation.

29

136.   As a finder of fact is not required to accept evidence of increased risk as conclusively establishing causation, I find that Plaintiff's evidence has not established that Defendant was a factual cause of Santee's below-the-knee right leg amputation by not providing special shoes until approximately five (5) to eight (8) weeks after his diabetic condition became known to USP Lewisburg staff.  I make this determination based on Santee's uncontrolled diabetic condition at the time of his arrival at USP Lewisburg.

137.   I also find that Defendant acted reasonably in regard to providing Santee special shoes by: (1) informing him of the application for special shoes three (3) weeks after his diabetic condition became known; and (2) attempting to fit him for special shoes five (5) weeks after his diabetic condition became known.

138.   Therefore, I find for Defendant on Plaintiff's failure to provide special footwear theory of negligence.

**d.    General Failure to Care and Follow Practice Guidelines**

139.   Plaintiff has failed to present sufficient evidence to recover on her general negligence theory related to Defendant's failure to care for Santee and follow the Practice Guidelines.

140.   Defendant, pursuant to 18 U.S.C. § 4042, had a duty to act reasonably in caring for Santee's diabetic condition once his condition was known, or reasonably should have been known.

141.   Santee's diabetic condition was known or should have been known on April 7, 2005 when Santee's blood sugar was determined to be 235 mg/dL.

142.   Defendant, through the conduct of USP Lewisburg staff, breached its legal duty to Santee when it waited until April 26, 2005 to actively care for Santee's diabetic condition, which included: (1) prescribing diabetes medication, glyburide, for Santee; (2) informing Santee of proper wound care; and (3) informing Santee of an application for special shoes.

143.   Although the Practice Guidelines are only recommendations for the treatment of diabetes, included in Defendant's breach of its legal duty to provide reasonable care was USP Lewisburg staff's apparent failure to conduct a baseline assessment of Santee's condition once his diabetic condition was known by Defendant.

144.   Plaintiff, nevertheless, failed to prove that Defendant was the factual cause of Santee's injuries.

145.   Plaintiff's causation testimony, provided by Dr. Sebastianelli, provided  that Defendant's failure to follow the Practice Guidelines upon Santee's arrival at USP Lewisburg increased the risk that Santee would ultimately need an amputation.

146.   As the finder of fact, I find that the increased risk to Santee by Defendant's failure to provide reasonable care from April 7, 2005 until April 26, 2005 was not the factual cause of Santee's below-the-knee right leg amputation.

147.   In light of Santee's previous foot problems and toe amputations dating back to the early 2000s, as well as the fact that he was not prescribed medication for diabetes from at least November of 2004 until April of 2005, I cannot find that Defendant's improper care of Santee (under a theory of ordinary negligence) for three (3) weeks in April of 2005 was a factual cause of Santee's injuries.

148.   Instead, I find that Plaintiff has only proven that Defendant's negligence increased the risk that Santee would suffer harm, without being a cause of Santee's injuries.

149.   To the extent that Plaintiff's evidence demonstrates that Defendant improperly cared for Santee after he was diagnosed with diabetes, Plaintiff's evidence is indicative of medical treatment and medical judgment, which is not proper proof of an ordinary negligence claim.

150.   Therefore, I find for Defendant on Plaintiff's general failure to care and follow

the Practice Guidelines theory of negligence.


An appropriate order follows.



 May 16, 2012                                    /s/ A. Richard Caputo
Date                                            A. Richard Caputo
                                                United States District Judge